**UNITED STATES of America,**
Appellee,

v.

**Orlando MIRANDA,**
**Defendant-Appellant.**

No. 753, Docket 74–2651.

United States Court of Appeals,
Second Circuit.

Argued March 17, 1975.

Decided Dec. 3, 1975.

1320

Irving Anolik, New York City, for defendant-appellant.

Ethan Levin-Epstein, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., Paul B. Bergman, Asst. U. S. Atty., of counsel), for appellee.

Before SMITH and TIMBERS, Circuit Judges, and BRYAN, District Judge.*

FREDERICK van PELT BRYAN, District Judge:

Orlando Miranda was convicted of (1) possessing with intent to distribute, and (2) distributing some 10 ounces of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 812 after a jury trial before Judge Orrin G. Judd in the United States District Court for the Eastern District of New York. He appeals from the judgment of conviction.[1]

Miranda does not contend that the evidence adduced at the trial was insufficient to sustain his conviction and, indeed, he could not well do so. He raises three issues which he contends require reversal. The first concerns the failure of the trial court to suppress testimony as to a conversation between Miranda and Gloria Rodas, an informant, on the ground that a tape recording of the conversation had been lost by the Drug Enforcement Administration and was not available at the trial. The second relates to the availability to the defense of two women who were not called as witnesses by the prosecution but who had been in the Jaguar Lounge bar on a number of occasions when Rodas and Miranda met. The third concerns the admission of evidence as to certain events which took place subsequent to the transaction alleged in the indictment.

Gloria Rodas was a major witness for the prosecution, who testified that she negotiated and carried out the purchase of 10 ounces of cocaine from Miranda for $10,000. Rodas had been cooperating with the Government following her arrest and plea of guilty to a narcotics conspiracy charge in an unrelated case.[2]

Rodas testified to the following effect:

On March 1, 1974, at the request of special agents of the Drug Enforcement Administration (DEA), she went to the Jaguar Lounge, a bar in Queens operated and partially owned by Miranda, and struck up an acquaintance with him there. During other visits to the Jaguar in March, she talked with him further. On March 15, 1974 Rodas brought up the subject of drugs with Miranda. Miranda told her that people he knew were in jail but that they were expected to be released shortly and he would have more to tell her then. She told Miranda that she was interested in buying a kilogram of cocaine and Miranda said they would talk more about it later.

On March 21, 1974, Rodas again went to the Jaguar and talked with Miranda about the proposed purchase of cocaine. Miranda told her the purchase could be arranged and they agreed to meet the following night to discuss the matter further. On March 22, 1974 they met at the Jaguar, as arranged. Miranda told Rodas he could let her have 10½ ounces, which was all he could get his hands on, for $10,000 ($1,000 an ounce) with the extra half ounce thrown in as a token of friendship. They agreed to consummate the transaction on March 25, 1974.

Rodas had kept the special agents informed of her negotiations with Miranda. On the afternoon of March 25 she met with Agents McMullan and Schnackenberg. She was searched, supplied with a Kel transmitter, and given $6,000 in cash. The agents searched her car. She then drove to the Jaguar Lounge in her car with the agents' car following her. She met Miranda in the Jaguar as arranged. Miranda asked her to drive him a short distance to an auto body shop where his car was being repaired. Dur-

---

* Frederick vP. Bryan, of the Southern District of New York, sitting by designation.

1. Miranda was sentenced to six years' imprisonment on each of the two counts, to run concurrently, with a special parole term of four years to follow, and fined $2,500 on Count 1. He is on bail pending appeal.

2. Prior to her testimony in the case at bar, Rodas had been sentenced to five years' probation on this conviction.

ing the drive Miranda told her in Spanish that he had the merchandise with him. She said she could not take it all since she only had $6,000 of the $10,000 purchase money with her. Miranda said he would let her have the full amount of the purchase and would trust her for the balance of $4,000. He offered to let her taste a sample of the cocaine to test its purity. She replied that if he trusted her, she would trust him. Miranda produced a packet of cocaine, placed it in an attache case on the back seat of the car, and took the $6,000. Rodas dropped him at the auto body shop.

Rodas drove to a rendezvous with the agents who removed the packet of cocaine from the attache case and field-tested it. The package contained some 10 ounces of cocaine.

On April 2, 1974, Rodas met with the agents. She was searched, again wired with a transmitter, and given the balance of $4,000 to pay off Miranda. She talked with Miranda in the kitchen of the Jaguar Lounge and gave him the money. They then discussed the possibility of future narcotics purchases and Miranda told her they would have to be discreet since many policemen would be coming to his bar during the forthcoming baseball season.

Rodas returned to the Jaguar on April 19, 1974 and asked Miranda to meet with her "brother" who, she said, was also in the narcotics business. On May 8, 1974 Rodas and an undercover agent, Pinol, posing as her brother, met Miranda in the Jaguar. Pinol thanked Miranda for the favor he had done his "sister" and suggested that Miranda supply him with a kilo of cocaine. Miranda replied that he was getting out of the business.

Group Supervisor McMullan and Special Agents Schnackenberg, Castillo and Pinol also testified for the prosecution. In substance, the testimony of McMullan and Schnackenberg corroborated the testimony of Rodas with respect to the arrangements for her to cooperate with the Government in this case, her meetings with the agents during the course of her negotiations with Miranda, and

her visits to the Jaguar Lounge, a number of which were covered by surveillance. McMullan and Schnackenberg also testified that Rodas had been equipped with a radio transmitter before her visits to the Jaguar on March 25 and April 2, 1974; that she had been given $6,000 in government funds on March 25 and $4,000 on April 2; that on March 25 both her person and her car, including the attache case on the back seat, had been searched before she left for the Jaguar; and that a similar search had been made on April 2.

On March 25, McMullan, Schnackenberg and Castillo followed Rodas in their car and kept her under surveillance. They saw her enter the Jaguar, emerge with Miranda and drive to the auto body shop with him. During the drive the Kel radio transmitter which Rodas had with her was turned on and the conversation in Spanish between Rodas and Miranda was heard clearly by the agents in the surveilling car and recorded on tape. Castillo was the only agent in the car who understood Spanish and he gave a running account of the conversation to the other agents in English as it came over the transmitter. Agent Castillo's testimony as to the transmitted conversation of March 25 corroborated Rodas' version of it.

After Miranda left Rodas' car at the body shop, the agents met Rodas and took the packet of cocaine from the attache case where Rodas said Miranda had placed it. They proceeded to the office of the DEA with the cocaine and the tape of the Rodas-Miranda conversation, where Agent Castillo listened to a portion of the tape. Shortly after that, however, the agents were unable to find the tape, which had inexplicably disappeared from the DEA office. It was never found again, though the agents made an exhaustive search for it. Thus, the tape was unavailable at the trial, both to the prosecution and the defense.

On April 2, 1974, when Rodas went to the Jaguar to deliver the $4,000 final payment to Miranda, the radio transmitter on her person was again turned on.

The tape of her conversation with Miranda at the Jaguar turned out to be inaudible and thus there was no recording of what was said in that conversation either.

Agent Pinol's testimony in substance corroborated Rodas' account of her final conversation with Miranda at the Jaguar on May 8, 1974.

Miranda took the stand and was the only witness for the defense. He strenuously denied selling cocaine to Rodas, receiving any money from her, or having anything to do with narcotics. He stated that he had talked with Rodas from time to time at the Jaguar and that she had driven him from the Jaguar to the auto body shop on March 25. On one occasion, when Rodas told him her brother had a lot of money to buy cocaine, he refused to discuss the subject and walked away from her. His version of the conversation with Rodas during the March 25 drive to the auto body shop was that, at Rodas' request, he had picked up and opened a valise in the back of the car and looked into it. He saw some white powder enclosed in plastic. Rodas said it was cocaine and that she was showing it to him to make him nervous or afraid. He got out of the car and told her he would not drive in her car again. Nevertheless, he admitted talking with Rodas several times thereafter and meeting her supposed "brother", Agent Pinol.

### I.

The testimony of Rodas and Agent Castillo as to the conversation of March 25, 1974 between Rodas and Miranda, concerning delivery of cocaine by Miranda and payment of $6,000 to him, was a crucial part of the prosecution's case. During the trial the defense moved to suppress testimony of Rodas and Castillo concerning the March 25 conversation on the grounds that the tape recording which had been made of the conversation had been lost by the Government and was unavailable, and that the Government had failed to disclose prior to the second day of the trial that there was such a recording which had been lost. The motion to suppress was denied by the trial court, as was a defense motion for a judgment of acquittal on similar grounds at the conclusion of the case. Thereafter, a motion to set aside the verdict and for a judgment of acquittal on these grounds was also denied.

Miranda's first contention is that the unavailability of the tape and the trial court's failure to suppress the Rodas-Castillo testimony as to the March 25 conversation require reversal of the conviction and the entry of a judgment of acquittal.

During the pre-trial proceedings, the prosecution furnished defense counsel with tapes and transcripts of several conversations pursuant to Fed.R.Crim.P. 16. The Assistant United States Attorney informed the court and defense counsel that he had turned over all the tape recordings in the Government's possession. At the time he made that statement, the Assistant was well aware that a tape recording had been made of the March 25 Rodas-Miranda conversation and that it had been lost.[3]

In the material furnished to the defense under the Jencks Act, 18 U.S.C. § 3500, there was no mention in any of the agents' reports or in any of the other material of the March 25 tape recording or its loss. Defense counsel did not learn that a tape recording had been made of the conversation and had been lost until the morning of the second day of the three-day trial, Wednesday, September 25, 1974. Due to Judge Judd's

---

**3.** The Assistant's representation to the court and defense counsel that all the tapes and recordings in the Government's possession had been turned over, while it was literally true, can scarcely be considered other than misleading. It left the impression that there had been no tape recording of the March 25 conversation. We strongly disapprove of such conduct, which is painfully close to sharp practice and unbecoming for a prosecutor representing the Government of the United States.

Friday motion calendar and the ensuing weekend, the trial was adjourned until Monday, September 30.

On Monday, September 30, at the request of the defense, the court permitted the defense to recall Agent Schnackenberg to the stand before the jury and cross-examine him at length as to the tape and its loss. The defense also cross-examined Supervisor McMullan and Agent Castillo extensively on these matters. In addition, there was redirect on the subject.

The substance of the testimony of the agents was as follows: The transmission of the March 25 conversation to the surveilling agents in their car was quite clear. The cassette on which the transmitted conversation was recorded was removed from the recording device and taken to the DEA office on the evening of March 25 by the agents who had listened to the transmission. Agent Castillo listened to some three minutes of the recording; apparently no one listened to the full recording. A day or two later, when Schnackenberg looked for the cassette recording in order to have it transcribed in accordance with the usual practice, it had inexplicably disappeared. Schnackenberg reported the loss to McMullan, his group supervisor. Despite repeated and diligent attempts to locate the cassette by the agents concerned, it could not be found. These efforts were renewed shortly before the trial at the request of the prosecutor, with the same negative result. No notes or other records concerning the cassette recording or its disappearance had been made.

The defense did not request that any further inquiry be conducted concerning the tape and the circumstances of its loss. Nor did it seek to examine Agents McMullan and Schnackenberg, either before the jury or in camera, with respect to Castillo's translation to them of the Miranda-Rodas conversation in Spanish as it was being transmitted to the agents' car on March 25. The defense moved for suppression of the Castillo-Rodas testimony solely on the basis of the evidence in the record. At the conclusion of the case it moved for a judgment of acquittal on the same record.

The evidence concerning the tape and its loss was before the jury. Defense counsel was in a position to make the most of that evidence in summation, and did so. The jury was entitled to consider such evidence in reaching its verdict. It found the defendant guilty on both counts.

On its motion to set aside the verdict, the defense did not seek a further hearing but again relied solely on the record. Judge Judd denied the motion on the basis of the record.

■ In a criminal case, the Government plainly has the obligation to make available to the defense evidentiary material in its possession which is disclosable under the due process safeguards of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or the requirements of Fed.R.Crim.P. 16 or the Jencks Act, 18 U.S.C. § 3500.

■ If the Government fails to carry out that obligation, a serious question arises as to whether such failure calls for the imposition of sanctions against the Government.[4] Whether or not sanctions for nondisclosure should be imposed depends in large measure upon the extent of the Government's culpability for failure to make disclosable material available to the defense, on the one hand, weighed against the amount of prejudice to the defense which resulted, on the other. *United States v. Pfingst,*

---

4. Such sanctions include the exclusion or suppression of other evidence concerning the subject matter of the undisclosed material, *see* Fed.R.Crim.P. 16(d)(2); 18 U.S.C. § 3500(d); the grant of a new trial, *see* Fed.R.Crim.P. 33; 18 U.S.C. § 3500(d); *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 570–71 (2d Cir. 1961); or, in exceptional circumstances, dismissal of the indictment or the direction of a judgment of acquittal, *see United States v. Heath,* 147 F.Supp. 877 (D.Hawaii 1957); *United States v. Jackson,* 508 F.2d 1001, 1005–08 (7th Cir. 1975); *United States v. Banks,* 374 F.Supp. 321, 328 n. 2 (D.S.D.1974).

490 F.2d 262, 277 (2d Cir. 1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974); *United States v. Mayersohn*, 452 F.2d 521, 526 (2d Cir. 1971); *United States v. Rosner*, 516 F.2d 269, 272 (2d Cir. 1975), *petition for cert. filed*, 44 U.S.L.W. 3207 (U.S. Oct. 7, 1975); *United States v. Hilton*, 521 F.2d 164, 166 (2d Cir. 1975); *United States v. Kahn*, 472 F.2d 272, 287 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973).

In the recent case of *United States v. Morell*, 524 F.2d 550 (2d Cir. 1975), the issue was whether defendants convicted of serious narcotics offenses were entitled to a new trial because the Government had failed to make disclosable evidentiary material in its possession available to the defense. While an appeal from the judgment of conviction was pending, the prosecution advised this court and the defense that it had for the first time discovered the existence of a confidential file in the possession of the Drug Enforcement Administration relating to dealings and arrangements between narcotics agents and the prosecution's principal witness, the informant Valdez. The documentary material in the file bore directly on Valdez' credibility and was likely to have bolstered the theory of the defense. The court of appeals then remanded the case to the district court to make appropriate findings with respect to the new material which had come to light. The district court, without holding an evidentiary hearing as to the Government's culpability for its failure to disclose the material earlier or making any determination with respect thereto, denied defendant a new trial.

When the appeal again came before this court, Judge Moore stated:

> The standards governing the grant of a new trial [for failure to disclose evidence in the Government's possession favorable to defendant] vary according to the extent of the government's culpability. If the prosecutor has intentionally suppressed evidence or ignored evidence whose high value to the de-

fense could not have escaped his attention, a new trial is warranted if the evidence is merely material or favorable to the defense. *E. g., United States v. Kahn*, 472 F.2d 272, 287 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1972); *United States v. Keogh*, 391 F.2d 138, 146–47 (2d Cir. 1968). If, on the other hand, the government's failure to disclose is merely inadvertent or negligent, a new trial is required only if there is a "significant chance that this added item, developed by skilled counsel as it would have been could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *United States v. Rosner*, 516 F.2d 269, 272 (2d Cir. 1975); *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975); *Grant v. Alldredge*, 498 F.2d 376, 380 (2d Cir. 1974); *United States v. Miller*, 411 F.2d 825, 832 (2d Cir. 1969).

At 553.

After reviewing the material which the Government had failed to disclose, Judge Moore found there was not "a significant chance" that the undisclosed information would have affected the jury's verdict and therefore concluded that

> [i]f the district court finds that the failure to disclose this material was deliberate or the result of gross negligence on the part of the government, it should order a new trial. If, however, the failure was simply inadvertent or negligent, a new trial would not be required.

At 555. The case was again remanded to the district court with directions to hold an evidentiary hearing and make appropriate findings as to the extent of the Government's culpability for its failure to disclose. *See also United States v. Hilton, supra*, at 166.

■ Where disclosable evidentiary material which came into the possession of the Government has been lost or destroyed, and is unavailable to the defense for that reason, the standards for

determining whether sanctions should be imposed on the Government, like those applied in *Morell, supra,* and the cases there cited, depend on the extent of the Government's culpability for the loss or destruction and the amount of the prejudice to the defense which resulted. However, in such a case, unlike *Morell,* since the material cannot be produced for inspection, it may be difficult to ascertain what its value to the defense would have been.

In *United States v. Augello,* 451 F.2d 1167 (2d Cir. 1971), *cert. denied,* 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972), part of an allegedly incriminating conversation between the defendant and the principal witness for the prosecution had been recorded on tape. The tapes of the conversation had been destroyed by police agents because they were said to be unintelligible. On appeal from the judgment of conviction, one of defendant's contentions was based on the failure to suppress the testimony of the police agents about the taped conversation, because the tape had been destroyed and was unavailable at the trial. This court rejected that contention, stating:

> While the degree of compliance by the police agents with existing departmental regulations is not crystal clear, the record taken as a whole gives no indication of such bad faith or negligence in the destruction of the allegedly unintelligible tapes as would call for the suppression of the testimony of the police agents.

451 F.2d at 1170.

In so holding, this court relied on *United States v. Bryant,* 142 U.S.App. D.C. 132, 439 F.2d 642 (1971) (*Bryant I*). *Bryant I* was an appeal from narcotics convictions. A tape recording of a crucial conversation between the defendants and an undercover narcotics agent regarding the transaction at issue was unaccountably lost and thus was unavailable at the trial. The appellants contended that the testimony of the narcotics agent with respect to the recorded conversation should have been sup-

pressed because the Government had failed to produce the tape, and that they therefore were entitled to a new trial or dismissal of the indictment.

The narcotics agent who had custody of the tape testified in substance that since he had never intended the tape to be used in the trial, he had made no effort to preserve it. The court characterized the case as one of "intentional non-preservation by an investigative official," and went on to say that the agent's conduct lay somewhere in the middle "between good faith but inadvertent loss and bad faith destruction," 439 F.2d at 647. It held that the tape was evidence which the Government was obligated to preserve and disclose to the defense, either under *Brady,* Rule 16, or the Jencks Act, and that whether or not the sanction of suppression of the narcotics agent's testimony should be imposed depended on the circumstances of the loss. It found the record was inadequate for a determination of that question and therefore remanded the case to the district court with directions to

> weigh the degree of negligence or bad faith involved, the importance of the evidence lost and the evidence of guilt adduced at the trial in order to come to a determination that will serve the ends of justice.

439 F.2d at 653.

The court pointed out, 439 F.2d at 651, that the Government had the burden of explaining the loss of evidence which came into its possession and of showing that the loss was not intentional, deliberate, or in bad faith, and that earnest efforts had been made to find the evidence, once its loss was discovered.

On remand, the district judge, after an evidentiary hearing, held that the convictions should stand. 331 F.Supp. 927 (D.D.C.1971). The case then again came before the court of appeals in *United States v. Bryant,* 145 U.S.App.D.C. 259, 448 F.2d 1182 (1971) (*Bryant II*). The court found that although the negligence of the agent was "regrettably great", it

was outweighed by other factors. It held that

> under the more pragmatic balancing approach which we have adopted for these cases, the unintelligibility of the tapes—when combined with the very strong evidence of guilt adduced at trial—outweighs the negligence involved in the loss of the tape.

448 F.2d at 1184. The court affirmed the convictions.[5]

Other circuits have dealt with the loss of disclosable evidence by the Government on a case-by-case basis, and have refused to impose sanctions where the loss was inadvertent and not deliberate or in bad faith, and there was not such prejudice to the defendant as to deny him a fair trial. *See United States v. Love,* 482 F.2d 213 (5th Cir. 1973); *United States v. Sewar,* 468 F.2d 236 (9th Cir. 1972), *cert. denied,* 410 U.S. 916, 93 S.Ct. 972, 35 L.Ed.2d 278 (1973); *United States v. Shafer,* 445 F.2d 579, 581–82 (7th Cir.), *cert. denied,* 404 U.S. 986, 92 S.Ct. 448, 30 L.Ed.2d 370 (1971); *United States v. Rojas,* 502 F.2d 1042, 1044–45 (5th Cir. 1974). *See also United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), cited in *United States v. Augello, supra,* where the Supreme Court indicated that while sanctions should be imposed on the Government for bad faith suppression of evidence, they are not appropriate where the loss was in good faith and earnest efforts had been made to find the evidence, once its loss was discovered.

In the case at bar there is no question that the defense would have been entitled to have the March 25 tape recording made available either under *Brady,* Rule 16, or the Jencks Act had it not been lost. Thus, the first question presented is the extent of the Government's culpability for the loss of the tape.

Here, unlike *Morell, Bryant I,* and other cases cited, an additional hearing before the trial judge on the culpability question is unnecessary. The circumstances of the loss of the tape and the efforts made to find it, once the loss was discovered, were thoroughly covered by the testimony in the record. Most of that testimony was adduced by the defense in its cross-examination of the narcotics agents. The defense was content to rest on that testimony in its various suppression motions.

On the basis of that evidence, Judge Judd, who as the judge presiding at the trial was in a position to assess the credibility of the witnesses, found that while the loss of the tape "indicates negligence on the part of the government agents, the Court cannot find that the loss was intentional or in bad faith * * *."

The evidence before Judge Judd was quite sufficient to satisfy the Government's burden on the issue of culpability. Judge Judd's finding on that issue is supported by the evidence in the record and cannot be said to be clearly erroneous. It is dispositive of that issue. *See United States v. Rosner, supra,* at 272–73, citing *United States v. Johnson,* 327 U.S. 106, 111, 66 S.Ct. 464, 90 L.Ed. 562 (1946); *United States v. Pfingst, supra,* at 273 n. 11.

Judge Judd further found that the defendant had not been prejudiced by the failure of the prosecution to disclose the loss of the tape earlier since the "defense counsel have not indicated any major

---

**5.** The statements in *Bryant I* and *II* indicating that, in the future, the District of Columbia Circuit would place a much heavier burden on the Government to avoid the imposition of sanctions for nondisclosure due to loss of evidence is plainly *dictum.* These standards for the future were not applied in the actual case before the District of Columbia Circuit in *Bryant* and we do not apply them in the case at bar. It was the "pragmatic balancing approach" which was the basis of the *Bryant* decisions.

Moreover, it is at least doubtful whether the District of Columbia Circuit has materially altered that approach in cases subsequent to *Bryant.* *See United States v. Patterson,* 161 U.S.App.D.C. 281, 495 F.2d 107, 112 n. 7 (1974); *United States v. Carpenter,* 166 U.S.App.D.C. 358, 510 F.2d 738, 740 (1975); *United States v. Person,* 155 U.S.App.D.C. 455, 478 F.2d 659, 660 (1973); *United States v. Ferguson,* 162 U.S.App.D.C. 268, 498 F.2d 1001, 1005–06, *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 145 (1974).

differences in procedure which would have been followed at the trial had the loss of the tapes [sic] been known from the beginning," and "[t]here is no indication * * * that the defendant would have been materially better off had he known of the lost tape earlier than he did." As the judge who presided at the trial, Judge Judd was in the best position to assess the defendant's contention that he had been prejudiced by failure to disclose earlier. We accept his findings that no such prejudice occurred.

■ Thus, this is not a case of intentional, deliberate, or bad-faith loss or suppression of evidence by government agents in which prophylactic sanctions against the Government would be appropriate. The loss of the tape recording by the agents was merely inadvertent or negligent. The question, then, is whether the defense was so greatly prejudiced by the unavailability of the recording at the trial as to require the imposition of sanctions against the Government.

In considering this question, several distinctive features of this case must be borne in mind. In cases such as *Morell, supra,* and *Rosner, supra,* where the Government had failed in its obligation to disclose evidence, the undisclosed evidence was before the court for evaluation. Assessment of the effect of such evidence, had it been produced at the trial, was relatively easy.

In the case at bar, however, since the recording was irretrievably lost, there is no way in which it can be determined with certainty what it contained. Indeed, since there is no evidence that anyone heard the entire recording played back, it is not even certain that the key portions of the recording were intelligible.

The Government strenuously urges that if the recording had not been lost it would have fully confirmed the testimony of Castillo and Rodas concerning the March 25 Rodas-Miranda conversation. It contends that if any prejudice arose because of the loss of the tape, it was the Government which was prejudiced and not the defense.

The defense, on the other hand, goes on the theory that the recording would have confirmed Miranda's version of the conversation and thus would have exculpated him.

While it cannot be determined with certainty which of these contentions is correct, in the light of the record concerning the transmission of the March 25 conversation to the surveilling car and the circumstances of the loss of the tape, it is more likely that the recording would have supported the version of the conversation testified to by the government witnesses rather than the somewhat incredible version testified to by Miranda.

Moreover, here, unlike most cases involving government failure to produce disclosable evidence, the fact that there was a tape recording of the March 25 conversation and the circumstances of its loss were fully brought out by the defense before the jury in its extensive cross-examination of the government agents. In its summation to the jury, the defense made the most of the loss of the tape as casting doubt on the Government's case and tending to support Miranda's version of the March 25 conversation. The jury evidently rejected this contention in reaching its verdict of guilty.

It may be noted that, quite understandably, the defense elected not to elicit from McMullan and Schnackenberg, the non-Spanish speaking agents in the surveilling car on March 25, testimony as to the simultaneous running account in English which agent Castillo gave them of the transmission of the Rodas-Miranda conversation. Their testimony on this subject might well have tended to confirm the Government's version of that conversation.

The case against Miranda was a strong one. It by no means rested on the testimony of the informant Rodas alone. Much of her testimony was corroborated by the testimony of the government agents who followed the progress of the

meetings between Rodas and Miranda and the results of those meetings closely. For example, the Rodas version of her conversation of March 25 with Miranda was corroborated by agent Castillo's testimony as to the transmission of the conversation to the surveilling car, and supported by the testimony as to the search of Rodas and her car before she picked up Miranda and the packet of cocaine which the agents found in the attache case in her car after she had left Miranda at the body shop. Her testimony as to the May 8 conversation with Miranda concerning narcotics was corroborated by agent Pinol and, to a large extent, by Miranda himself.

Judge Judd concluded that under all the circumstances here the absence of the tape did not deprive Miranda of a fair trial. We cannot disagree with that conclusion.

As Judge Judd further pointed out, there is no indication that any additional evidence could be produced on a new trial. Thus, nothing would be gained if a new trial were granted. The alternatives here are between affirmance of the conviction, on one hand, and, on the other, the setting aside of the conviction and the entry of a judgment of acquittal on the ground that the Castillo-Rodas testimony as to the crucial March 25 conversation must be suppressed and stricken from the record. The latter alternative would be an unduly heavy sanction to impose upon the Government for the loss of a piece of evidence concerning a subject on which there was other primary evidence available and adduced. Cf. *United States v. Fishel*, 324 F.Supp. 429, 430–32 (S.D.N.Y.1971).

Whether we apply the pragmatic balancing test of *Bryant* or the significant chance test of *Morell* and *Rosner* to the case at bar, the result is the same. Under the pragmatic balancing test, the strength of the case against the defend-ant, coupled with the evidence placed before the jury as to the circumstances of the loss, outweighs the relatively slight degree of negligence involved in the loss of the tape.[6] Viewing the record as a whole, we also find that there is not a significant chance that the lost recording, had it been available to the defense at the trial, would have avoided a verdict of guilty. Thus, there is no ground on either theory for the imposition of the sanction of suppression.

We hold that the denials by Judge Judd (1) of the motion during the trial to suppress the testimony of the government witnesses as to the March 25 conversation, (2) of the motion for judgment of acquittal at the close of the trial on the ground of failure to suppress such testimony, and (3) of the motion to set aside the verdict and for a judgment of acquittal on the same ground, did not constitute reversible error.

## II.

Miranda's next contention relates to the availability to the defense of two women, "Georgie" and "Toni," who were not called as witnesses by the prosecution but who had been at the Jaguar Lounge on several occasions when Rodas met Miranda.

Appellant's argument that he was prejudiced by what occurred at the trial with respect to "Georgie" and "Toni" is based in substantial measure on a misapprehension of the evidence in the record. The appellant is quite wrong in stating that "both of these women were admittedly present at virtually all of the conversations with the appellant concerning drug transactions." The record is to the contrary. Rodas testified that while from time to time "Georgie" and "Toni" were at the Jaguar Lounge when she met Miranda, neither was present at any of the conversations she had with Miranda concerning narcotics.[7] Nor was either

---

6. In *Bryant II* the court refused to apply the sanction of suppression, even though it found that "the degree of negligence shown is regrettably great," 448 F.2d at 1184.

7. Rodas testified that all her conversations with Miranda concerning drugs were "in pri-vate" and that "no one ever heard any part of our conversation." This assertion was not contradicted by Miranda when he took the stand and admitted talking with Rodas on occasion about narcotics.

of them in Rodas' car on March 25 when the narcotics transaction was consummated.

■ The fact that Rodas had met Miranda at the Jaguar was not in issue. There was no reason for the prosecution to call either "Georgie" or "Toni" as witnesses, as the appellant implies, or to inform the defense about them prior to trial.

After Rodas referred to "Georgie" in her testimony, "Georgie" was produced by the prosecution at the request of the defense. As the defense was made aware, "Georgie" had pled guilty to the same narcotics conspiracy charge as Rodas and was cooperating with the Government. After interviewing "Georgie," the defense declined to call her as a witness.

Both Rodas and "Georgie" refused to disclose "Toni's" identity or where she could be found on the ground that such disclosure might place her in danger. There was nothing to indicate that "Toni" had any relationship with the Government and the prosecution represented to the court that it had no control over her or any knowledge of her whereabouts. There is no reason to question that representation and the defense apparently accepted it.

In support of his contention that what occurred with respect to "Georgie" and "Toni" requires reversal, appellant relies on *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and *United States v. Baum,* 482 F.2d 1325 (2nd Cir. 1973). Such reliance is misplaced.

In *Roviaro,* the Supreme Court reversed a narcotics conviction because the Government had refused

> to disclose the identity of an undercover employee who had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to

whether the accused knowingly transported the drugs as charged.

353 U.S. at 55, 77 S.Ct. at 625.

In *Baum,* the prosecution had refused to reveal the identity of a government witness, whose testimony was crucial both to the prosecution and to the defense, under the witness took the stand. At the completion of the direct examination of the witness, the defense requested a continuance in order to prepare adequately for a cross-examination. The continuance was denied. This court concluded that there were no valid considerations to justify concealment of the identity of the prosecution witness until he took the stand, and that the defendant had not been afforded "a fair opportunity to meet the critical and damaging proof on an offense not presented against him in the indictment," 482 F.2d at 1332. It therefore reversed the conviction and granted a new trial.

It requires no extended discussion to demonstrate that neither *Roviaro* nor *Baum* are apposite here. There was no showing that either "Georgie" or "Toni" were material witnesses for either the prosecution or the defense. "Georgie" was produced by the Government and interviewed by the defense. As far as appears, "Toni" had no relationship with the Government. There was no need for the Government to go further than it did. *Cf. e. g., United States v. D'Amato,* 493 F.2d 359, 366 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 50 (1974); *United States v. Ortega,* 471 F.2d 1350, 1359 (2d Cir. 1972), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); *United States v. Johnson,* 467 F.2d 630, 640 n. 9 (2d Cir. 1972), *cert. denied,* 410 U.S. 932, 93 S.Ct. 382, 35 L.Ed.2d 595 (1973).

Appellant also suggests that it was error not to charge that the jury could infer from the Government's failure to call "Georgie" and "Toni" as witnesses that their testimony would have been adverse to the prosecution.

■ Whether or not such a "missing witness" charge should be given lies in

the sound discretion of the trial court. *United States v. Llamas,* 280 F.2d 392, 393 (2d Cir. 1960); *United States v. Cotter,* 60 F.2d 689, 691–92 (2d Cir.), *cert. denied,* 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932); *United States v. Ferguson,* 162 App.D.C. 268, 498 F.2d 1001, 1008, *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 145 (1974). Cf. C. McCormick, Handbook of the Law of Evidence § 272, at 659 (2d ed. 1972).

Here the court correctly charged the "general rule" that

> if it is specially within the power of the prosecution or defense to produce a witness who could give material testimony on an issue or to produce other evidence, the failure to call the witness may give rise to an inference that the evidence would be unfavorable.

It then added that

> You cannot draw any such inference with regard to a witness or exhibit that is equally available to both parties or where the witness testimony would be merely cumulative.

No exception was taken to the charge on this subject. The charge as given was entirely proper in the circumstances of this case. *See United States v. D'Angiolillo,* 340 F.2d 453, 457, 457 n. 5 (2d Cir.), *cert. denied,* 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965); *United States v. Super,* 492 F.2d 319, 323 (2d Cir.), *cert. denied,* 419 U.S. 876, 95 S.Ct. 139, 42 L.Ed.2d 115 (1974); *United States v. Bergman,* 354 F.2d 931, 935 (2d Cir. 1966). *Cf. United States v. Brown,* 511 F.2d 920, 925 (2d Cir. 1975).

## III.

Appellant's final contention is that it was error to admit testimony as to conversations between Miranda, Rodas, and Agent Pinol relating to narcotics subsequent to March 25, when the transaction charged in the indictment was consummated. This contention is also without merit.

It is settled law in this circuit that "evidence of similar acts, including other crimes, is admissible when it is substantially relevant for a purpose other than merely to show defendant's criminal character or disposition." *United States v. Deaton,* 381 F.2d 114, 117 (2d Cir. 1967); *United States v. Brettholz,* 485 F.2d 483, 487 (2d Cir. 1973), *cert. denied,* 415 U.S. 976, 94 S.Ct. 1561, 39 L.Ed.2d 871 (1974); *United States v. Warren,* 453 F.2d 738, 745 (2d Cir.), *cert. denied,* 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972); *United States v. Bozza,* 365 F.2d 206, 213 (2d Cir. 1966); *United States v. Torres,* 519 F.2d 723, 727 (2d Cir. 1975). The conversations subsequent to March 25 were plainly relevant to the question of Miranda's intent to possess and distribute cocaine, and were properly admitted under limiting instructions to the jury that they could only "be considered as bearing on his [Miranda's] intention in connection with the March 25th charge."

The judgment of conviction is affirmed.