**UNITED STATES of America,**

v.

**Russell BUFALINO, Herbert Jacobs, Michael Sparber and Joseph Lapadura, Defendants.**

**No. 76 Cr. 982 (MEL).**

United States District Court, S. D. New York.

June 7, 1977.

Robert B. Fiske, Jr., U. S. Atty., New York City, for the United States; Barbara S. Jones, Asst. U. S. Atty., of counsel.

Wilfred L. Davis, New York City, for Russell Bufalino.

Harold O. N. Frankel, New York City, for Herbert Jacobs.

William J. Gilbreth, New York City, for Michael Sparber.

John Iannuzzi, New York City, for Joseph Lapadura.

LASKER, District Judge.

Russell Bufalino, Michael Sparber, Herbert Jacobs and Joseph Lapadura are charged in a two count indictment with using extortionate means to collect extensions of credit from one Jack Napoli and conspiracy to do the same in violation of 18 U.S.C. § 894. They move to suppress all evidence, including Nagra tape recordings, transcripts thereof and testimony, with respect to three conversations between Napoli and one or more of the defendants on the ground that the F.B.I. agent in charge of the investigation intentionally destroyed a duplicate set of recordings of those same conversations made by the use of a Kel transmitting device. In addition, Sparber and Bufalino move for divers relief based on their suspicion of other improper government action in the conduct of the investigation.

## A. The Destruction of the Kel Tapes

An evidentiary hearing was held in two parts on May 5 and May 9, 1977. The government presented the testimony of Stephen F. Edwards, the agent who destroyed the Kel tapes, and Paul Ginsberg, an expert in audio engineering. The defendants presented no witnesses. The facts, which are not disputed, are as follows.

### 1. Facts

On three occasions during the course of the investigation which resulted in the pending indictment, Edwards equipped Napoli, a government informant, with recording devices and taped conversations between Napoli and various individuals, including the defendants Bufalino, Sparber and Jacobs. These conversations took place, for the most part, in and near the Vesuvio Restaurant on West 48th Street in Manhattan. They form a vital part of the government's case.

On each occasion Napoli was outfitted with a Nagra tape recorder and a Kel transmitter, and the two units operated simultaneously. The Nagra device is a self-contained tape recording unit. The Kel transmitter, as its named implies, is only a transmitting device, through which Napoli's conversations were monitored by F.B.I. agents at several nearby locations. The agents recorded the Kel transmissions as they were broadcast over radio receivers.

All three conversations were recorded on the Nagra machine. The F.B.I. agents made a single recording of the Kel transmission of the first conversation, which took place on April 12, 1976, on a Sony cassette located in a truck parked several hundred feet from the Vesuvio Restaurant. They made two recordings of the Kel transmission of the second and third conversations, on April 16th and 20th, one on the Sony cassette, which was in a surveillance car, and one on an SK 8 tape recorder located in the suitcase of a surveillance agent who was inside the restaurant.

Agent Edwards, who personally monitored all three conversations, listened to all of the tapes. (Tr. 75) He played each of the Nagra tapes as well as the single Kel recording of the 12th and the two Kel recordings of the 20th on the day they were made. He played the two Kel recordings of the conversation of the 16th several days after that date. With regard to each of the three conversations, Edwards listened at least once to all of the recordings at one sitting, one after the other.[1] He testified

---

[1] He did not specifically compare portions of the two or three recordings of each conversa-

tion to learn whether an inaudible portion of the Nagra tape may have been audible on ei-

that for each conversation the Nagra recording was "far superior" to any of the Kels. (Tr. 79–80) The latter, he said, were "largely inaudible." (Tr. 79) This result conformed to his experience in previous situations where duplicate recordings had been made in that the Nagra recordings were consistently more audible than recordings of Kel transmissions.

Edwards testified that his principal purpose in using the Kel transmitter was to monitor the conversations and be able to step in to protect Napoli in the event of danger. He stated that the taping of the Kel transmissions was strictly a secondary, back-up procedure "to have something salvageable" in the event the Nagra device malfunctioned. (Tr. 104) Having compared the recordings and found the Nagras to be superior, Edwards concluded that there was "absolutely no use for [the Kel recordings]." (Tr. 80) He believed it to be standard F.B.I. procedure to destroy such tapes, and after consulting with brother agents who confirmed that this was the thing to do, he disposed of them. This was, as best Edwards could recall, about a week or so after they were made.

Although Edwards was in constant contact with the United States Attorney's Office, and in fact forwarded the Nagra tapes to the Assistant handling the investigation within a day or two of their making (Tr. 141), he never informed the office that the Kel transmissions had been taped or that the tapes had been destroyed. These facts first came to light when Edwards was asked by defense counsel whether the transmissions had been taped at a pretrial conference on November 18, 1976.

The government's expert, Ginsberg, testified that Nagra recording equipment is in all respects superior to the Kel device and that, assuming proper functioning, Nagra recordings are accordingly consistently more audible and reliable than those made on Kel machinery. It is, of course, not disputed, however, that there were at least

some audible passages on the Kel recordings. Further, it cannot be said with certainty that there were no portions of the conversations audibly recorded through the use of the Kel machine which were inaudible on the Nagra tapes, although Edwards did testify that he recalls no such instances and believes none to have existed. See note 1, *supra.*

### 2. *Discussion*

■ The defendants argue that Edwards' deliberate destruction of tape recordings which are clearly discoverable under Fed.R. Cr.P. 16 and fall within the Jencks Act, 18 U.S.C. § 3500, requires suppression of all remaining evidence regarding the three conversations. The government responds that such relief is unwarranted where, as here, the destroyed tapes were, at best, grossly inferior duplications of the Nagra material, all of which has been carefully preserved and made fully available to the defense, and the destruction, though intentional, was in good faith. In these circumstances, the government argues, the defense should be required to make a showing of prejudice, such as the real possibility that exculpatory material may have been lost, before the sanction of exclusion should be considered.

In determining whether to impose sanctions on the government for the loss or destruction of evidentiary material a court is required to weigh "the extent of the Government's culpability for the loss or destruction and the amount of prejudice to the defense which resulted." *United States v. Miranda,* 526 F.2d 1319, 1325–26 (2d Cir. 1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976). Here, government culpability is high. It is undisputed that Edwards deliberately destroyed the Kel tapes. The defendants' argument that this, alone, requires suppression, however, is an overstatement. Indeed, in *United States v. Augello,* 451 F.2d 1167 (2d Cir. 1971), *cert. denied,* 405 U.S. 1070, 92 S.Ct. 1518, 31

ther of the Kel tapes. However his testimony was emphatic that so far as he noted at the time and could recollect, there was nothing on

the Kel tapes which was not also on the Nagras. (Tr. 151–52)

L.Ed.2d 802 (1972), cited with approval in Miranda, supra, the Second Circuit affirmed a conviction which was challenged, inter alia, on the grounds that the district court failed to suppress evidence regarding a conversation between the defendant and a government informant because the *single* recording of that conversation had been intentionally destroyed by police. Significantly, the reason given by the police for their action in *Augello* was that the tape recording, which appears to have been made by the use of a Kel transmitter, was unintelligible. 451 F.2d at 1169–70.

On the other side of the coin, indication of prejudice to the defendants from Edwards' actions is singularly weak. The defendants attempt to discredit the reliability of the Nagra recording by suggesting that Napoli might have turned the machine off at certain points in the conversations or tampered with the tapes in the period they were in his custody following the conversations but prior to being picked up by the F.B.I. agents. (Tr. 89–100) In contrast, they argue, the Kel recordings would necessarily have been reliably complete. This attack on the Nagra tapes is purely speculative, and it is undermined by the fact that there was no evidence that Napoli had tampered with the Nagra machine.[2] In addition, Edwards, who monitored all three conversations and listened to all of the tapes,

testified that so far as he is aware, the Nagra machine was neither turned off nor tampered with and the resulting recording is a continuous and complete reflection of the conversation. (Tr. 153–54) Moreover, we credit Edwards' testimony that the Kel recordings were seriously inferior to those made on the Nagra machine, "very distorted and static" (Tr. 80) and, indeed, "largely inaudible." (Tr. 79)[3] In contrast, although there undeniably are portions which cannot be discerned, the Nagra recordings, when filtered, are of a relatively high quality.[4]

In *United States v. Miranda, supra,* the court approved the district court's refusal to suppress testimony by an undercover informant and police officers about the critical conversation between the informant and the defendant, where the conversation had been monitored and recorded by the use of a Kel device, but the tape, the *only* recording made, had been lost due to negligence of the police. The court observed that in view of all the other evidence it was "more likely" that the tape would have corroborated the government's version of the conversation than the defendant's and that the defense had been permitted to bring out all the facts surrounding the loss of the tape and to attempt to make the most out of it before the jury. 526 F.2d at 1327–29. In these circumstances, the court concluded that suppression "would be an

---

**2.** Edwards testified that in accordance with standard procedure he personally placed the Nagra device on Napoli's waist and activated it, and that, although the tape had run out, the machine was still in the "on" position when received by the F.B.I. at the conclusion of the conversations. (Tr. 89–90; 98) As a precaution against tampering, the on-off switch was taped in the "on" position and the entire machine was wrapped in evidence tape around the midsection. On its return to the F.B.I. there was no indication that either the machine or the tape had been tampered with in any way. (Tr. 161–63)

The defendants sought to have Napoli, who is currently in the witness protection program, produced at the hearing for examination as to whether or not he interfered in any way with the Nagra recording device either during or after the conversations. This request was denied, but at trial the defendants will be permitted to question Napoli in this regard. Should Napoli's testimony alter the factual basis for

today's ruling, the defendants will be permitted to renew their motion to suppress.

**3.** The court has on numerous occasions in the past heard recordings made over a Kel transmitter and takes judicial notice that such recordings are often of poor quality and rarely of good quality. A technical explanation for the Kel's consistently inferior recording quality was provided by the testimony of the government's expert, Ginsberg.

**4.** On April 23, 1977 a hearing was conducted with regard to the audibility of the Nagra recordings. Significant portions of all three tapes were played through a filtering device, including, of course, those passages on which the government intends to rely at trial. Although certain short portions were found to be inaudible, the tape was, for the most part, found to be of exceptional clarity as tape recordings of this kind go.

unduly heavy sanction to impose upon the Government for the loss of a piece of evidence concerning a subject on which there was other primary evidence available and adduced." *Id.* at 1329.

The decision applies here. As in *Miranda,* there is no reason to believe that any material on the Kel tapes which might have clarified some of the inaudible portions of the Nagra tapes, assuming such material existed, would have been favorable to the defense, in view of the nature and content of the Nagra recordings. Thus, this is emphatically not a case, such as *United States v. Carrasco,* 537 F.2d 372 (9th Cir. 1976), on which the defendants rely, where the record indicates that the destroyed evidence is likely to have contained important evidentiary material not otherwise preserved which might prove helpful to the defendant. Nor, although the destruction was wilfull, is there any hint of bad faith in this record. Compare, *United States v. Lonardo,* 350 F.2d 523 (6th Cir. 1965). Indeed, the record indicates that Edwards believed he was acting in accordance with F.B.I. procedures. While this does not exonerate his actions, *United States v. Carrasco, supra,* 537 F.2d at 376; *Lee v. United States,* 125 U.S.App.D.C. 126, 368 F.2d 834, 837 (1966), destruction of tapes due to unintelligibility is in fact a practice which has been countenanced by the courts. *United States v. Augello, supra; United States v. Bryant,* 145 U.S.App.D.C. 259, 448 F.2d 1182, 1184 (1971) (intentional non-preservation of tapes). Under *Miranda,* suppression here might be inappropriate even if no other recordings were preserved. It is especially so given the existence of the complete set of Nagra tapes of generally high quality.[5]

This disposition of the motion should not be interpreted as approval of the procedures employed here by Agent Edwards.

Determinations as to the usefulness of tape recorded evidence containing Rule 16, "3500" and, possibly, *Brady* material, are for the court and counsel, not the F.B.I. Whatever burden the preservation of extra reels or cassettes of tape may impose on the facilities of law enforcement agencies is vastly outweighed by both the defendant's interest in the preservation and availability of *all* evidence which might arguably prove useful to him and the public interest in minimizing the threat to an otherwise sound prosecution posed by such careless practices. The Second Circuit has recently cautioned that the F.B.I. would be "well advised" to retain handwritten notes of interviews with witnesses even after final typewritten reports have been prepared. *United States v. Anzalone,* 2 Cir., 555 F.2d 317 at 321 (1977). This statement was made despite the fact that the court has consistently held such notes not to be Jencks Act material. *A fortiori,* a similar warning is in order with respect to tapes such as those here at issue, which are indisputably within the ambit both of Rule 16 and the Jencks Act.

**B. Other Alleged "Governmental Misconduct"**

■ Both Bufalino and Sparber move for additional relief based on another aspect of the case. The government has disclosed that the extensions of credit on which the indictment is based involve a series of transactions between Napoli and the defendant Jacobs sometime in February and/or March, 1977, in which Napoli obtained diamonds and certain other jewelry from Jacobs in return for promises of repayment and, in the case of the first transaction, for a check. Napoli's check, however, was written on the account of a defunct company, and it bounced. These and other circumstances tend to indicate that Napoli was

---

**5.** It is true that the *Miranda* court distinguished inadvertent loss from deliberate destruction and stated:

"[T]his is not a case of intentional, deliberate, or bad faith loss or suppression of evidence by government agents in which prophylactic sanctions against the Government would be appropriate. The loss of the tape recording

by the agents [in *Miranda* ] was merely inadvertent or negligent." 526 F.2d at 1328. Although *dicta* in this passage can be read to suggest that a showing of intentional destruction is alone enough to warrant suppression, for the reasons stated above we disagree with this interpretation.

attempting to defraud Jacobs. The government has further disclosed that Napoli first reported his difficulties with the defendants over his debt to Jacobs to state authorities in March, 1977, and to the F.B.I. in early April, at a time after the debt arose when the defendants were allegedly pressuring him for repayment. However, Napoli had previously given information regarding other activities to law enforcement officials. As part of this prior cooperation in the period January to March, 1977, Napoli gave information to the F.B.I. in Newark, New Jersey, which, although unrelated to the events here in issue, did contain minor references to the defendants Jacobs and Bufalino. He was paid $400. for this earlier information.

Based on these facts Sparber hypothesizes that the F.B.I. was behind Napoli's transaction with Jacobs from the inception. He moves 1) to suppress all evidence regarding these transactions on grounds of governmental misconduct and 2) for pretrial disclosure of material in the F.B.I. reports regarding Napoli's prior cooperation which might reveal, generally, that their involvement together at the outset of the transaction was greater than the government has represented and, specifically, the basis for the earlier $400. payment.

It is unclear whether Sparber's reference to misconduct is an allusion to possible entrapment or simply the fact that Napoli may have initially obtained the jewelry from Jacobs in the course of a fraudulent scheme. In either case there is no basis whatsoever for suppression. Though there is little to suggest entrapment based on the government's disclosures to date, Sparber will of course be free to attempt to establish this defense at trial. It is not grounds for pretrial relief in the form of suppression. Nor is there reason to believe the government was behind the initial "fraud" on Jacobs. Even if it was, however Sparber cites no authority for his claim that this would be misconduct in any way sufficient to warrant suppression.

▆ With regard to Sparber's request for disclosure, the court has examined *in camera* the F.B.I. reports regarding its dealings with Napoli from January through the events in question. The reports confirm the essential outlines of the government's initial representations regarding the history of Napoli's involvement as an informant. Accordingly there is no basis for furnishing these reports to counsel prior to trial, at which time, when Napoli takes the stand, they will of course be entitled to review them. 18 U.S.C. § 3500.

▆ Bufalino moves to dismiss the indictment on the grounds that the facts set out above preclude proof of an "extortionate extension of credit" as defined in 18 U.S.C. § 891(6). The short answer to this is that under 18 U.S.C. § 894, the only statute on which the indictment is based, there is no requirement that an extortionate extension of credit be established. Further, any suggestion that the facts alleged do not constitute an offense under § 894 because of the possibility that the underlying debt may itself have been incurred in the course of an illegal scheme by Napoli to defraud Jacobs is without merit. It is a violation of § 894 to use extortionate means to collect any extension of credit. Under § 891(1),

> "To extend credit means to . . . enter into any agreement . . . whereby repayment or satisfaction of *any debt . . . whether acknowledged or disputed, valid or invalid, and however arising,* may or will be deferred." (emphasis supplied)

There is thus no suggestion of a limitation such as that suggested by Bufalino in the language of the statute. Moreover, two courts of appeals have expressly held that the statute includes debts arising out of illegal or deceitful schemes by the debtor to take advantage of the creditor. *United States v. Annerino,* 495 F.2d 1159, 1166 (7th Cir. 1974) (unauthorized use of credit cards and misappropriation of partnership funds); *United States v. Briola,* 465 F.2d 1018, 1020 (10th Cir. 1972), *cert. denied,* 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688, *reh. denied,* 410 U.S. 960, 93 S.Ct. 1416, 35 L.Ed.2d 695 (1973) (theft from employer).

For the foregoing reasons, the motions to suppress due to the destruction of the Kel tapes are denied without prejudice to renewal at trial in the event the testimony justifies such a course. See note 2, *supra*. The other motions are denied.

It is so ordered.