BUFALINO v DETROIT MAGAZINE, INC

Docket Nos. 82179, 82180. Argued April 4, 1989 (Calendar No. 1). Decided December 28, 1989.

William E. Bufalino, Sr., and Marie Antoinette Bufalino, his wife, brought an action in the Wayne Circuit Court against the Detroit Magazine, Inc., its distributors, and others, claiming libel as a result of an article published by Detroit Magazine which referred to William Bufalino, Sr., as a leading member of an organized-crime family. The court, Harold M. Ryan, J., granted summary judgment for all defendants except Monthly Detroit and its distributors. The Court of Appeals, WAHLS, P.J., and GRIBBS, J. (N. J. LAMBROS, J., dissenting), reversed in an unpublished opinion per curiam, holding that summary judgment should have been granted for the remaining defendants under *New York Times v Sullivan,* 376 US 254 (1964), because William Bufalino was a public figure as a matter of law and because there was insufficient evidence of actual malice to raise a genuine issue of material fact for submission to a jury (Docket Nos. 81253, 80533). The plaintiffs were granted leave to appeal, limited to the question whether William E. Bufalino, Sr., is a public figure for purposes of this action.

In an opinion by Justice BOYLE, joined by Chief Justice RILEY and Justices BRICKLEY, CAVANAGH, ARCHER, and GRIFFIN, the Supreme Court *held:*

The Court of Appeals did not properly examine the question of William E. Bufalino, Sr.'s public-figure status, requiring remand to that Court for plenary consideration of that issue.

1. The issue of the plaintiff's status was raised and argued by the parties in the trial court. The same issue was raised in the Court of Appeals, and the trial court was assigned error for leaving the question for the jury. No factual disputes are involved. The determination of the plaintiff's status clearly is one of law, to be made on the basis of the existing record.

2. The Court of Appeals erred in concluding that the plaintiff conceded his public-figure status in his complaint. The allegations clearly do not amount to a concession of his legal status as a public figure, nor do they alone suffice to establish that status under the rigorous standards in the applicable case law. Because the Court of Appeals concluded that the plaintiff had

conceded the issue, it failed to engage in any truly substantive legal analysis in support of its conclusion. Thus, remand is required, not because the Court of Appeals reached the wrong conclusion, but because it failed to engage in any substantive legal analysis in support of that conclusion.

Justice LEVIN, concurring, stated that the judgment of the Court of Appeals should be vacated and the case remanded to the trial court for an evidentiary hearing to determine whether William E. Bufalino, Sr., is a public figure.

1. In an action for libel, a plaintiff who is a public official must establish by clear and convincing evidence that a defamatory statement is false and made with actual malice or reckless disregard for the truth. The requirement extends also to persons who are not public officials, but who are found to command a substantial amount of independent public interest at the time of a publication, as well as to public figures. A distinction is made between general-purpose public figures, who achieve status through clear evidence of general fame or notoriety in the community and pervasive involvement in the affairs of society, and limited-purpose public figures, who become so by being drawn or voluntarily injecting themselves into particular public controversies. The designation of a person as a general-purpose public figure is to be made sparingly. Absent clear evidence of general fame or notoriety in the community and pervasive involvement in the affairs of society, a person should not be deemed a public personality. Rather, a court should look to the nature and extent of the person's participation in the particular controversy giving rise to the defamation.

2. Where a defendant in a libel action claims that the plaintiff is a public figure, a court must decide both whether there is a particular public controversy and what the parameters of that controversy may be. Public controversy is not to be equated with all controversies of interest to the public. Public attention and media interest do not, in and of themselves, necessarily justify a finding that a person is a public figure. The term "public figure" expresses a legal conclusion. In this case, the plaintiffs did not concede that William Bufalino is a public figure. The legal analysis undertaken by the Court of Appeals appears to have melded the concepts of general-purpose and limited-purpose public figures. While finding that the plaintiff was a public figure for the limited purposes of the case, it did not delineate a particular public controversy or how he was drawn or thrust into the forefront of that controversy by having reputations in a number of fields. Alternatively, if the Court concluded that he was a general-purpose public figure, it

did not explain how he attained pervasive power and influence or pervasive fame or notoriety.

3. Monthly Detroit contends that the plaintiff is a general-purpose public figure, a designation applied sparingly by courts. In order to determine whether the plaintiff is a limited-purpose public figure, it is necessary to seek to identify the public controversy addressed in the Monthly Detroit article and determine whether the plaintiff has thrust himself into the forefront of that controversy or was involuntarily drawn into it. On the basis of the record, it is not possible to determine whether the plaintiff can be said to have so publicly injected himself, or to have been involuntarily drawn, into a public controversy as to be designated a public figure for a limited purpose.

Reversed and remanded.

*William E. Bufalino, II; Bendure & Thomas, P.C.* (by *Mark R. Bendure*), of counsel, for the plaintiffs.

*Harvey, Kruse, Westen & Milan, P.C.* (by *Thomas F. Kauza* and *Marisa C. Petrella*), for defendants Ludington News Co., et al.

*Kasiborski, Ronayne & Flaska, P.C.* (*John J. Ronayne, III* and *Kim R. Kolb*), for defendants Detroit Magazine, Inc., et al.

Amici Curiae:

*Butzel, Long, Gust, Klein & Van Zile, P.C.* (by *Richard E. Rassel, James E. Stewart,* and *Leonard M. Niehoff*), for The Detroit News, Inc.

*Honigman, Miller, Schwartz & Cohn, P.C.* (by *Herschel P. Fink*), for Detroit Free Press, Inc.

*Keywell & Rosenfeld* (by *Dawn L. Phillips*) for Michigan Press Association.

BOYLE, J. This libel action arose out of the publication of an article in the September, 1981, issue of Monthly Detroit magazine entitled "Jack

Tocco: Mob Boss or Model Citizen?" The allegedly libelous statement that is the subject of this dispute is found in a portion of the article devoted to explaining how organized crime in Detroit has been strengthened and perpetuated by intermarriage among the city's crime "families." In support of this contention, the article's author, Edward P. Whelan, quotes a lengthy paragraph from a book written by Francis Ianni, a former Columbia University sociology professor, entitled, *A Family Business—Kinship & Social Control in Organized Crime.* The paragraph outlines, as an example of interfamily alliances, the relationship between the Tocco and Zerilli families, and contains the following statement:

> Antoinette (Meli) Tocco's cousin Marie is married to William Bufalino, reputedly a leading member of an upstate New York family.

Plaintiff contends that this statement is false and defamatory to the extent that it links him with an organized crime "family."

Plaintiff filed this action against these defendants and others in September, 1981. In July, 1984, all of the defendants[1] filed a motion for summary disposition, claiming a qualified privilege to make the statement under two distinct theories. Defendants first claimed a privilege under the First Amendment of the United States Constitution on the basis of plaintiff's "public figure" status. *New York Times v Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964); *Gertz v Robert Welch, Inc,* 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974). They also claimed a qualified privilege

---

[1] The *Detroit Magazine* defendants filed a motion for summary disposition on July 18, 1984. The motion was concurred in by the *Ludington News* defendants on July 26, 1984.

under the common law of this state, since the statement commented upon a matter of "public interest." See, e.g., *Kurz v Evening News Ass'n,* 144 Mich App 205; 375 NW2d 391 (1985); *Peisner v Detroit Free Press,* 82 Mich App 153, 158; 266 NW2d 693 (1978).

Both kinds of privilege, defendants argued, required plaintiff to show "actual malice" on the part of defendants in publishing the statement. Since plaintiff's complaint failed to allege any facts which would support such a claim, defendants continued, they were entitled to summary disposition for plaintiff's failure to state a claim upon which relief could be granted.[2]

Hearings on the motion were held on August 6, 1984, and August 21, 1984. At the conclusion of the second hearing, the trial court granted the motion with respect to a number of individual defendants,[3] but denied the motion as to the instant defendants. The court's stated reasons for the denial both at the hearing and in its eventual order are brief and of limited value. At the hearing, the court essentially stated only that it believed there to be a "genuine issue of material fact involved in this case." It did not identify that issue as whether actual malice existed, nor did it indicate that it was relying on that standard at all, either on the basis of the federal constitutional argument or the common-law qualified privilege claim. The court did state, however, that it would leave the question of plaintiff's public-figure status

[2] Defendants also alleged, briefly, that they were entitled to summary disposition because there were no genuine issues of material fact to be determined at trial in light of the affidavits submitted by the various individual defendants, which they claimed "negate[d] any suggestion of 'actual malice.'"

[3] Defendants also had argued independently of the defense of privilege that the plaintiff had failed to state a claim against those named individual defendants connected with defendant *Detroit Magazine* who were not involved in any way with the publication of the article.

for purposes of the constitutional defense for "the jury to decide."[4]

Defendants sought an immediate appeal in the Court of Appeals, raising essentially the same arguments as were raised before the trial court, and claiming additionally that the trial court had erred in leaving the question of plaintiff's public-figure status to the jury. The Court of Appeals granted leave to appeal and ultimately reversed the decision of the lower court. The Court concluded initially that plaintiff was a public figure as a matter of law, having conceded that very issue in his complaint;[5] thus, actual malice was the standard of defendants' liability. It then found that the trial court had erred in denying the motion for summary judgment, since plaintiff's general allegations of actual malice were com-

---

[4] The trial court's written order of September 18, 1984, denying summary judgment as to these defendants was equally vague, stating only that "this Court does hereby . . . find that a genuine issue as to some material facts do [sic] exist."

[5] This "concession," according to the Court of Appeals, is found in paragraphs 60-65 of plaintiff's amended complaint:

"60. The Plaintiff, William E. Bufalino, has a national reputation for being a labor leader; and he will submit admissible proof of this claim during the trial of this cause.

"61. That the Plaintiff, William E. Bufalino, has a reputation of being a leader in the fight for civil rights fair housing laws. He will submit admissible proof during the trial of this cause.

"62. The Plaintiff, William E. Bufalino, has a reputation of being a leader in the struggle for ethnic equality. He will submit admissible proofs during the trial of this cause.

"63. The Plaintiff, William E. Bufalino, has a reputation for being a poet. He will submit admissible proof during the trial of this cause.

"64. The Plaintiff, William E. Bufalino, has a reputation for being a lawyer and a citizen who protects his good name. He will submit admissible proof at the trial of this cause.

"65. The Plaintiff, William E. Bufalino, has a reputation of being a lecturer. He made speeches at Notre Dame University, Wayne State University and was invited to lecture, and did lecture, to the students of law at Dickinson School of Law in Carlisle, Pennsylvania."

pletely unsupported by any facts from which malice could be inferred, and therefore they failed to raise a genuine issue of material fact for submission to a jury. The Court did not consider defendants' claim of qualified privilege under this state's common law.[6]

This Court granted leave to appeal, limited to the threshold question whether plaintiff is a public figure for purposes of this action. 431 Mich 870 (1988).[7] Upon review of the record and the Court of Appeals opinion, we now conclude that the Court of Appeals never properly examined the question of plaintiff's public-figure status, and that this case therefore should be remanded to that Court for plenary consideration of that issue.

I

The Court of Appeals found plaintiff to be a public figure because he had "concede[d] as much" in his amended complaint, which, again, alleges his "national reputation" as, among other things, a labor leader, a poet, a lawyer, and a lecturer. The Court stated:

It is not necessary to trace the history of qualified privilege or to set out the standards defining those persons against whom the defense of quali-

[6] Presumably, the Court of Appeals declined to address the defendants' claim of "public interest privilege" because it found that claim to have been effectively defeated by our decision in *Rouch v Enquirer & News of Battle Creek,* 427 Mich 157; 398 NW2d 245 (1986), issued while this case was pending before the Court of Appeals. Defendants appear to agree with this conclusion.

[7] Our grant order specifically limited the issue to "whether the *lead plaintiff* is a public figure." (Emphasis added.) The Court of Appeals conclusion that Mr. Bufalino's wife, Marie Antoinette Bufalino, had not been defamed because as to her the statement was "wholly true" was not appealed. Nor can we say that the Court of Appeals clearly erred in reaching that conclusion. Thus, "plaintiff" in this case refers only to the named plaintiff, William E. Bufalino, Sr.

fied privilege might be asserted in a libel case. The applicable case law clearly expresses the controlling principles and sets forth the guidelines for making appropriate determinations. *For the limited purposes of this matter, we conclude that the plaintiffs concede in their complaint that they are public figures, (supra, amended complaint, paragraphs 60-65) and, as such, that defendants are granted the right of qualified privilege in reporting and/or commenting upon plaintiffs. [Citations omitted. Bufalino v Detroit Magazine, Inc, unpublished opinion per curiam, decided August 24, 1987 (Docket Nos. 80533, 81253), slip op pp 2-3.]*

We disagree that plaintiff conceded his public-figure status in his complaint. The allegations contained in plaintiff's complaint clearly do *not* amount to a concession of his *legal* status as a public figure. Moreover, at the risk of reaching the same sort of unsupported conclusion at which the Court of Appeals arrives, it seems safe to conclude that the allegations do not *alone* suffice to establish that status under the rigorous standards announced in the "applicable case law."

The Court's error in concluding that plaintiff had conceded this issue is significant to our disposition of this case, since as a result, and despite its references to "applicable case law" and "controlling principles," etc., it failed to engage in any truly substantive legal analysis in support of its conclusion. It failed, for example, to indicate whether plaintiff should be considered a general-purpose or limited-purpose public figure. Even assuming that it intended plaintiff to be viewed as a limited-purpose public figure, the Court also failed to identify the particular "public controversy" with which plaintiff can properly be associated. In short, the Court of Appeals, because it thought plaintiff had simply conceded the question, failed

to discuss in any meaningful way the merits of defendant's claim in terms of the "applicable case law" found in *New York Times, Gertz,* and their progeny.

It thus appears that this Court has open to it two alternatives. We can, as a practical matter, simply decide the merits of the issue on the basis of the record before us. While the question whether a person is a public figure for purposes of a defamation action is initially a question for the trial court, the determination is in effect one of law, and can be made by a reviewing court in the first instance on the record as submitted.[8]

In this case, the issue was raised by the motion and argued by the parties. On appeal, the same issue was raised, and the trial court was assigned error for leaving the question to the jury. There are no "factual disputes" involved here. Plaintiff does not claim, for example, that he was never investigated by the United States Senate, or that he has not been mentioned in books dealing with organized crime and been the subject of numerous newspaper articles.[9] Nor does he, like Justice

---

[8] In *Rosenblatt v Baer,* 383 US 75, 88; 86 S Ct 669; 15 L Ed 2d 597 (1966), the United States Supreme Court concluded that, "as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.' " Among the authorities cited for this proposition in *Rosenblatt* is Prosser, Torts, the current edition of which states that "[w]hether the occasion was a privileged one is a question to be determined by the court as an issue of law, unless of course the facts are in dispute, in which case the jury will be instructed as to the proper rules to apply." Prosser, Torts (5th ed), § 115, p 835. See also 3 Restatement Torts, 2d, § 619, p 316; *Tavoulareas v Piro,* 260 US App DC 39; 817 F2d 762 (1987); *Trotter v Jack Anderson Enterprises, Inc,* 818 F2d 431, 433 (CA 5, 1987); *Rebozo v Washington Post Co,* 637 F2d 375, 379 (CA 5, 1981).

[9] It appears from a review of the transcripts of the hearings on the defendants' motion that the trial court found there to be "genuine issues of fact" only with respect to the existence or absence of malice, and not actually with respect to plaintiff's status as a public figure or the existence a privilege in general. To the extent that the trial

LEVIN, challenge the "authentic[ity]" of any of defendants' proofs. Thus, the determination of plaintiff's status is clearly one of law, to be made on the basis of the existing record, and as such may be made by a reviewing court. *Bonnette v West Ottawa Public Schools,* 165 Mich App 460; 419 NW2d 593 (1987); *Capac Bus Drivers Ass'n v Capac Community Schools Bd of Ed,* 140 Mich App 542; 364 NW2d 739 (1985).[10]

The fact that the question has been briefed and argued in this Court weighs in favor of a disposi-

---

court's decision to leave the question whether plaintiff is a public figure to the jury can be seen as resulting from its conclusion that there were issues of fact raised by defendants' proofs on that matter, we disagree with that finding.

[10] Justice LEVIN believes that the record before this Court is simply insufficient to allow it to correctly apply the legal standards he discusses at some length (perhaps unnecessarily, given the fact that he, too, would remand this case, albeit to the trial court, rather than the Court of Appeals) in his opinion:

> The defendants seek to persuade this Court with a number of attachments to affidavits that Bufalino is a public figure. These attachments appear to consist of Congressional Committee reports, other reports, newspaper clippings, and copies of pages from books. Many of these attachments are undated and are not attributed to any publisher. A significant number of them are copied in an illegible manner. None of them are authenticated.
>
> This Court cannot assume that the documents are what they purport to be, that they say what the defendants tell us they say, that it does not matter when they were published, and that it does not matter where or to what extent they were circulated. [*Post,* pp 791-792.]

We disagree with Justice LEVIN that the state of the record below can or should preclude us from addressing the issue presented. The trial court in this case conducted two days of hearings on defendants' motion for summary judgment, during which defendants attempted to establish a qualified privilege on the basis of the plaintiff's status as a public figure. What this Court has before it, and what the Court of Appeals had before it, is the record upon which the defendants chose to submit to the trial court their claim that plaintiff is a public figure. The question is whether these proofs in fact establish that status. Justice LEVIN's concerns seem more appropriately addressed, if at all, to the merits of defendants' claim than to our ability to decide the matter.

tion on the merits. The other avenue open to this Court, however, is to remand the case to the Court of Appeals for plenary consideration of the issue. We choose this course for two reasons. First, should the Court of Appeals reach the correct conclusion, on the basis of a proper analysis, after full consideration of the issue, it would be unnecessary for this Court to address the matter further. In addition, should further appellate review be required, we would have available the reasoning of the Court of Appeals. In sum, despite the fact that arguments have been heard in this Court on the merits of the question, we conclude that both the parties and this Court would best be served by remand to the Court of Appeals for full consideration of this matter.

We therefore remand this case to the Court of Appeals for plenary consideration of the question whether plaintiff is a public figure for purposes of this libel action. We caution the Court of Appeals that, in doing so, this Court does not wish to be seen as preferring a particular result in this case. A remand is required in this instance not because the Court of Appeals reached the wrong conclusion on this issue, but because it failed, perhaps understandably, to engage in any substantive legal analysis in support of that conclusion. On remand, the Court of Appeals is to reach the result it finds compelled by the entire record before it.

We do not retain jurisdiction.

RILEY, C.J., and BRICKLEY, CAVANAGH, ARCHER, and GRIFFIN, JJ., concurred with BOYLE, J.

LEVIN, J. The question presented is whether plaintiff, William E. Bufalino, Sr., is a public figure for purposes of this libel action.

The subject of the alleged libel is a passage from a September, 1981, Monthly Detroit article entitled "Jack Tocco: Mob Boss or Model Citizen?" The plaintiff was named in the article as one of thirty-five persons in a single paragraph quoted from a book[1] whom the author highlighted as examples of intermarriage among leading organized crime families. The article quoted the following pertinent passage from the book:

> Antoinette (Meli) Tocco's cousin Marie is married to William Bufalino, reputedly a leading member of an upstate New York family.

The parties to this action appear to agree that the word "family" refers to an organized crime family.

Bufalino commenced this action against the publisher of the magazine and its distributors, among others, and the defendants moved for summary judgment. The trial court granted summary judgment except as to Monthly Detroit and its distributors.

On appeal by Monthly Detroit and its distributors, the Court of Appeals reversed, holding that summary judgment should have been granted under the rule of *New York Times v Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964), because Bufalino was a public figure as a matter of law and because there was insufficient evidence of actual malice to raise a genuine issue of material fact for submission to a jury.

The Court of Appeals stressed the allegations in the complaint that Bufalino has a "national repu-

---

[1] Ianni, *A Family Business: Kinship & Social Control in Organized Crime* (New York: Russell Sage, 1972).

tation for being a labor leader" and a "reputation" in other endeavors.[2]

This Court granted leave to appeal to consider whether Bufalino is a public figure. I would vacate the decision of the Court of Appeals and remand this case to the trial court. An evidentiary hearing is required to determine whether Bufalino is a public figure.

---

[2] The Court of Appeals said:

A careful review of the entire file convinces this Court that, as a matter of law, plaintiffs should be considered public figures. Plaintiffs concede as much in their amended complaint where they assert:

"60. The Plaintiff, William E. Bufalino, has a national reputation for being a labor leader; and he will submit admissible proof of this claim during the trial of this cause.

"61. That the Plaintiff, William E. Bufalino, has a reputation of being a leader in the fight for civil rights fair housing laws. He will submit admissible proof during the trial of this cause.

"62. The Plaintiff, William E. Bufalino, has a reputation of being a leader in the struggle for ethnic equality. He will submit admissible proofs during the trial of this cause.

"63. The Plaintiff, William E. Bufalino, has a reputation for being a poet. He will submit admissible proof during the trial of this cause.

"64. The Plaintiff, William E. Bufalino, has a reputation for being a lawyer and a citizen who protects his good name. He will submit admissible proof at the trial of this cause.

"65. The Plaintiff, William E. Bufalino, has a reputation of being a lecturer. He made speeches at Notre Dame University, Wayne State University and was invited to lecture, and did lecture, to the students of law at Dickinson School of Law in Carlisle, Pennsylvania."

It is not necessary to trace the history of qualified privilege or to set out the standards defining those persons against whom the defense of qualified privilege might be asserted in a libel case. The applicable case law clearly expresses the controlling principles and sets forth the guidelines for making appropriate determinations. For the limited purposes of this matter, we conclude that the *plaintiffs concede in their complaint that they are public figures,* (*supra,* amended complaint, paragraphs 60-65) [emphasis added] and, as such, that defendants are granted the right of qualified privilege in reporting and/or commenting upon plaintiffs. [*Bufalino v Detroit Magazine, Inc,* unpublished opinion per curiam, decided August 24, 1987 (Docket Nos. 80533, 81253), slip op, pp 2-3.]

I

*New York Times v Sullivan, supra,* pp 279-280, was the first of a number of decisions by the United States Supreme Court that have reordered the balance in state defamation law between the constitutional protections of free speech and press and protection of a person's reputational interest. *Sullivan* held that the First Amendment[3] requires a person who is a public official to establish by clear and convincing evidence that a defamatory statement is false and made with actual malice or reckless disregard for the truth.

Several rationales were mentioned by the Court. Discussion on issues of public concern "should be uninhibited, robust, and wide-open [although] it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.,* p 270. The Court reasoned that vigorous public debate necessarily would result in some false statements, and that failure to protect even false statements would result in acts of self-censorship destructive to the principle of vigorous public debate. The Court also sought to protect defendants from self-censorship which might result from threats of prospective litigation. *Id.,* pp 271-272, 278-279.

In *Curtis Publishing Co v Butts,* 388 US 130, 154; 87 S Ct 1975; 18 L Ed 2d 1094 (1967), the Court extended *Sullivan's* free speech and press protections to defamation actions brought by persons who were not public officials, who were found to command "a substantial amount of independent public interest at the time of the publications," and " 'public figures.' "

The Court subsequently distinguished between a general-purpose public figure and a limited-pur-

[3] US Const, Am I.

pose public figure. The former achieves such status through "clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society . . . ." *Gertz v Robert Welch, Inc,* 418 US 323, 352; 94 S Ct 2997; 41 L Ed 2d 789 (1974); 75 ALR3d 616, 623. The latter become so by "being drawn or voluntarily injecting [themselves] into . . . particular public controvers[ies] . . . ."

> For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. [*Gertz v United States, supra,* p 345.][4]

---

4  [The] designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, *an individual voluntarily injects himself or is drawn into a particular public controversy* and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions. [*Gertz, supra,* p 351. Emphasis added.]

The language which suggests that a person can be "drawn into a particular public controversy" left room for the possibility that one could become a public figure involuntarily without "voluntarily inject[ing]" himself into a public controversy. The United States Supreme Court wrote, "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own," but qualified the statement by cautioning that "the *instances of truly involuntary public figures must be exceedingly rare.*" *Id.,* p 345. The Court has not alluded to the concept of an involuntary public figure since *Gertz,* and the suggestion has been made that the designation is not merely "exceedingly rare," but, rather, extinct. *Schultz v Reader's Digest Ass'n,* 468 F Supp 551, 559 (ED Mich, 1979); note, *Defining a public controversy in the constitutional law of defamation,* 69 Va L R 931, 937 (1983); Rosen, *Media lament—the rise and fall of involuntary public figures,* 54 St John's L R 487, 507, 509 (1980); note, *The*

Although the Court spoke of a "public figure for all purposes," it indicated that the general-purpose public figure designation should sparingly be found:

> We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the *nature and extent of an individual's participation in the particular controversy giving rise to the defamation.* [*Id.,* p 352. Emphasis added.]

The Court has found four persons *not* to be public figures.

In *Gertz v Robert Welch, Inc, supra,* pp 351-352, the Court declared that, although active in the community and professional affairs, plaintiff attorney, who was an officer of local civic groups and professional organizations and an author, was not a public figure where he achieved no fame or notoriety in the community nor discussed the subject litigation with the press.

In *Time, Inc v Firestone,* 424 US 448; 96 S Ct 958; 47 L Ed 2d 154 (1976), the Court declared that a socialite and former wife of a member of a wealthy family was not a public figure, although she was a "400" member of Palm Beach society and an active member of a sporting set whose activities predictably attracted the attention of a sizeable portion of the public, so much so that she subscribed to a press-clipping service.

In *Hutchinson v Proxmire,* 443 US 111; 99 S Ct

*involuntary public figure class of* Gertz v Robert Welch: *Dead or merely dormant?*, 14 U Mich J L Ref 71, 72 (1980). (Emphasis added.)

2675; 61 L Ed 2d 411 (1979), the Court ruled that the plaintiff, a scientist, researcher, professor, government employee, and recipient of federal grants, was not a public figure as a result of receiving Senator Proxmire's "Golden Fleece" award, indicative of wasteful government spending.

In *Wolston v Reader's Digest Ass'n,* 443 US 157; 99 S Ct 2701; 61 L Ed 2d 450 (1979), the Court held that the plaintiff, interviewed in 1957 by the FBI respecting his relationship to an aunt and uncle who pled guilty of espionage in the Rosenberg case, was not a public figure although he had pled guilty of contempt for failing to appear before a federal grand jury investigating Soviet espionage activity.

II

The Court of Appeals found that Bufalino was a limited-purpose public figure, but did not identify the "particular public controversy" into which he was "drawn" or "voluntarily inject[ed] himself." The Court rested its decision on Bufalino's allegations in his complaint about his reputation as a labor leader, leader in the fight for fair housing, civil rights, and ethnic equality without identifying a particular public controversy.

Bufalino is an attorney. For many years, he was closely associated with Jimmy Hoffa and the Teamsters Union. Bufalino is a cousin of Russell Bufalino, a twice-convicted organized-crime figure in Pennsylvania. Organized-crime investigations, by a committee of the United States Congress and by the Commonwealth of Pennsylvania, have reported Russell Bufalino's involvement in organized crime, William Bufalino's relationship with Russell Bufalino, and William Bufalino's involvement in activities under investigation.

Bufalino has commenced lawsuits alleging libel and filed a petition with the Congress for redress of grievances respecting alleged injuries resulting from federal investigations.

Monthly Detroit has provided the following more detailed summary of the evidence presented in support of the motions for summary disposition.

In 1947, Bufalino became president of Local 985 of the Teamsters Union and commenced a long association with Teamster president Jimmy Hoffa. Over twenty-five years before the article was published, in 1953, a House subcommittee, chaired by Representative Clare E. Hoffman, began investigating racketeering in Detroit. The Hoffman Committee focused on Hoffa and Bufalino as Local 985's president. The report of the committee stated:

> [T]here existed a gigantic, wicked conspiracy to, through the use of force, threats of force and economic pressure, extort and collect millions of dollars not only from unorganized workers but from members of unions who are in good standing, from independent businessmen, and, on occasion, from the Federal Government itself. . . .
>
> The teamsters union, Local 985, through its president William E. Bufalino, is the principal offender and perpetrator of the racketeering, extortion, and gangsterism. . . . The union attempted, and to some extent succeeded, in obtaining a monopoly in the "juke-box" business.[5]

Bufalino drew the attention of the United States Senate Select Committee on Improper Activities in the Labor or Management Field, known as the "McClellan Committee." Senate Report No. 1139, part 3, pp 836-837. The report of the committee stated:

---

[5] Investigation on Racketeering in the Detroit Area, Joint Subcommittee Report, 1954, pp 2, 4.

Bufalino complained before the committee that he had been associated unjustly with underworld figures that had met at Apalachin, N.Y., in November 1957. However, he refused to deny under oath that a relationship did exist between him and, among others, Russell Bufalino. The committee discovered a letter Bufalino wrote to the Billboard after the Apalachin meeting, in which he extolled the virtues of Russell Bufalino, a man he stated he had known all his life. Testimony established that Bufalino was closely associated in business with hoodlums and racketeers.

The committee's reaction was summarized at the termination of Bufalino's testimony:

"The Chairman. . . . The operations of Local 985 of the Teamsters Union, headed by Mr. Hoffa's associate, William E. Bufalino, represent a most disgraceful type of unionism. It is a leech preying upon working men and women to provide personal aggrandizement for Mr. Bufalino and his friends. . . . [N]owhere in this hearing is there to be found one scintilla of evidence that local 985 has done anything to help the wages and working conditions of its members in those industries. To the contrary . . . members of Mr. Bufalino's local had their wages drastically reduced after they became union members and their employers signed contracts with local 985.

"[T]he operations of local 985 amount to nothing less than a shakedown and extortion of businessmen.

"[T]hey perpetrate a dastardly fraud upon human beings the way this union operates. I don't want any misunderstanding about the Chair's conclusion. . . .

"It is also clearly shown that Bufalino got his start in the jukebox business in 1946 in partnership with and with the backing of certain key figures of the Detroit underworld . . . jukebox companies operating with underworld backing have also had the assistance of Mr. Bufalino.

"Thus we find a union in alliance with racketeers and which fails to in any way exercise the

proper obligations of labor unionism toward its members and toward the community."

An exhibit was introduced during the course of those hearings which reflects the results of a study of organized crime relationships. The chart shows the marriage of Bufalino and his wife as establishing a relationship between the Angelo Meli family of Detroit and the Russell Bufalino family of Pennsylvania.[6]

Bufalino's association with organized crime was also the subject of comment by another Senate subcommittee. In its 1965 *Report on Organized Crime and Illicit Traffic in Narcotics,* the Subcommittee on Investigation of the Committee on Government Operations identified Bufalino as a "criminal associate" of Russell Bufalino. Senate Report No. 72.

In the 1960's, Bufalino was appointed by a federal court, at the request of the Teamsters, as a representative on a court-established Board of Monitors which governed the Teamsters Union while Hoffa was incarcerated. During the course of the investigation of the disappearance of Hoffa, Bufalino represented several grand jury witnesses and, as a result of his manner and method of representing those persons, received a substantial amount of publicity. On three different occasions in connection with his representation of Hoffa or

---

[6] The 1970 and 1980 reports of the Pennsylvania Crime Commission contain lengthy references to the organized crime activities of Russell Bufalino and his associates. Russell Bufalino was convicted of separate federal charges of extortion, *United States v Bufalino,* 576 F2d 446 (CA 2, 1978), cert den 439 US 928 (1978), and obstruction of justice and civil rights violations as a consequence of attempting to murder a federal witness, *United States v Bufalino,* 683 F2d 639 (CA 2, 1982). See also *Bufalino v Immigration & Naturalization Service,* 473 F2d 728 (CA 3, 1973); *Bufalino v Kennedy,* 116 US App DC 266; 322 F2d 1016 (1963); *United States v Bufalino,* 285 F2d 408 (CA 2, 1960); *United States v Bufalino,* 518 F Supp 1190 (SD NY, 1981); *United States v Bufalino,* 432 F Supp 651 (SD NY, 1977).

the disappearance of Hoffa, he offered rewards ranging from $10,000 to $100,000. He brought defamation actions against Robert F. Kennedy, Hoffa's son, James P. Hoffa, two United States Department of Justice attorneys, and, in 1976, The Washington Post and Newsweek.

Defendants assert that there have been in excess of 170 newspaper reports concerning Bufalino, including reports in The Detroit News, The Detroit Free Press, The New York Times, and The Washington Post.

## III

Bufalino is an attorney and has, as he alleged in his complaint, a local and possibly national reputation with various constituencies, including labor circles. He has also been in business, including as an officer of a union local. Those activities do not distinguish him from many attorneys who have a local and national reputation with various constituencies, and who are also involved in business activities.

The United States Supreme Court in *Gertz* sought to protect against the conclusion that attorneys, by their involvement in activities unrelated to the law, have become public figures, by requiring that it be shown that they have been "drawn or voluntarily inject[ed] . . . into a particular public controversy."[7]

When a defendant in a libel action claims that

[7] The United States Supreme Court has reiterated this language of *Gertz:*

> Respondent did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society, and she did not thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it. [*Time, Inc v Firestone, supra,* p 453.]

the plaintiff is a public figure, a court must decide both whether there is a particular public controversy and what the parameters of that controversy may be.[8] The United States Supreme Court has rejected equating "public controversy" with "all controversies of interest to the public,"[9] *Firestone, supra,* p 454, thus making clear that public attention and media interest do not, in and of themselves, necessarily justify a finding that a person is a "public figure."

The Court of Appeals found that Bufalino was, "[f]or the limited purposes of this matter," a "public figure" because he "concede[s]" that he is one in his complaint. For this conclusion, the Court noted solely that Bufalino, in his amended complaint, alleged that he has a national reputation for being a labor leader, and a reputation for being a leader in the fight for civil rights, fair housing laws, a leader in the struggle for ethnic equality, a poet, a lawyer and citizen who protects his good name, and a lecturer at several universities.

Bufalino's complaint did not concede that he is a "public figure." The term "public figure" expresses a legal conclusion. The legal analysis undertaken by the Court of Appeals on the issue whether Bufalino is a public figure consisted of the statement that "[t]he applicable case law clearly ex-

[8] See *Schiavone Construction Co v Time, Inc,* 847 F2d 1069, 1078 (CA 3, 1988); *Blue Ridge Bank v Veribanc, Inc,* 866 F2d 681 (CA 4, 1989); *Contemporary Mission, Inc v The New York Times Co,* 842 F2d 612 (CA 2, 1988).

[9] The Court said it did not wish to adopt the view suggested by Justice Brennan in a plurality opinion in *Rosenbloom v Metromedia,* 403 US 29; 91 S Ct 1811; 29 L Ed 2d 296 (1971), which would have extended the *New York Times v Sullivan* standards to any statement made concerning a matter of general or public interest.

The *Rosenbloom* doctrine was rejected in *Gertz* because the *Gertz* Court believed it would require "state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not . . . . We doubt the wisdom of committing this task to the conscience [sic] of judges." *Gertz, supra,* p 346.

presses the controlling principles and sets forth the guidelines for making appropriate determinations."

It appears that the Court of Appeals melded the general-purpose public figure and limited-purpose public figure analyses. While holding that Bufalino was a public figure "[f]or the limited purposes of this matter," and thus suggesting that the scope of the Court's analysis was directed to whether Bufalino was a limited-purpose public figure, the Court delineated neither a particular public controversy nor how Bufalino was drawn into or thrust himself into the forefront of that controversy by, as his complaint alleges, having reputations in a number of fields.

Alternatively, if the Court of Appeals concluded that Bufalino, by alleging that he had reputations in a number of areas, was a general-purpose public figure, it did not explain how such allegations gave Bufalino such "pervasive power and influence,"[10] and such "pervasive fame or notoriety,"[11] as those terms are understood,[12] as to have enabled him to become a general-purpose public figure.

IV

Monthly Detroit contends that Bufalino is a general-purpose public figure. That designation has been applied sparingly by courts.[13] Courts have

---

[10] See *Gertz, supra,* p 345.

[11] *Id.,* p 351.

[12] We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. [*Gertz, supra,* p 352.]

[13] The following plaintiffs have been treated as general-purpose public figures, either by designation or consent: Johnny Carson, late-night television personality, *Carson v Allied News Co,* 529 F2d 206 (CA 7, 1976); William F. Buckley, political commentator, author, and

tended to limit the designation to those persons
whose names have become household words.[14]

V

In order to determine whether Bufalino is a
limited-purpose public figure, it is necessary to
seek to identify the public controversy addressed
in the Monthly Detroit article, and determine
whether Bufalino has thrust himself into the fore-
front of that controversy or was involuntarily
drawn into that controversy.

The Monthly Detroit article which is the subject
of this action was about Jack Tocco. It was not
about William Bufalino. Nor was it about Jimmy
Hoffa, Frank Fitzsimmons, Senator John McClel-
lan, Robert F. Kennedy, Tony Provenzano, or
other persons whom the defendants make some
effort to associate as being in the news with Bufa-
lino. Nor was the article about the Teamsters
Union or a Senate committee report issued by
Senator McClellan about twenty years before the
article was published. If the Monthly Detroit arti-
cle had concerned the Teamsters Union or the
McClellan report, a different question would be
presented.[15]

The Monthly Detroit article might be said to
focus on the issue of organized crime. The defen-
dants so contend. It is unclear what Bufalino has

television talk-show host, *Buckley v Littell,* 539 F2d 882 (CA 2, 1976);
the Church of Scientology, *Church of Scientology v Siegelman,* 475 F
Supp 950 (SD NY, 1979); William Loeb, political commentator and
publisher of the Manchester Union Leader, *Loeb v New Times Com-
munications Corp,* 497 F Supp 85 (SD NY, 1980); Bebe Rebozo, close
friend of President Nixon, *Rebozo v Washington Post Co,* 637 F2d 375
(CA 5, 1981).

[14] See *Waldbaum v Fairchild Publications, Inc,* 201 US App DC 301,
308; 627 F2d 1287 (1980).

[15] See *Meeropol v Nizer,* 560 F2d 1061 (CA 2, 1977); *Street v Nat'l
Broadcasting Co,* 645 F2d 1227 (CA 6, 1981).

done to thrust himself, in order to influence the resolution of the issues involved, into the forefront of a public controversy about organized crime, or how he has been drawn into a public controversy concerning organized crime as distinguished from other possibly newsworthy events.

Bufalino has brought actions in the past against others for allegedly defaming him, but such resort to legal process does not make him a public figure for the purposes of that particular controversy even if such actions were newsworthy.[16]

Bufalino in his capacity as an attorney might have represented notorious clients. But this would not render him a limited-purpose public figure respecting organized crime, even if such representation was a matter of media interest and notice.[17]

VI

Having defined what the particular public controversy *might* be in this case pertinent to whether Bufalino is a limited-purpose public figure, this Court is unable to determine whether Bufalino can be said to have so publicly injected himself, or been involuntarily drawn, into a public controversy concerning organized crime that he should be designated a public figure for that limited purpose.[18]

---

[16] See *Firestone, supra.*

[17] See *Gertz, supra.*

[18] The United States Supreme Court has said, regarding the role of the judge and jury in public figure defamation cases:

The record here, however, leaves open the possibility that respondent could have adduced proofs to bring his claim outside the *New York Times* rule. Moreover, even if the claim falls within *New York Times,* the record suggests respondent may be able to present a *jury question of malice* as there defined. Because the trial here was had before *New York Times,* we have concluded that we should not foreclose him from attempt-

The defendants seek to persuade this Court with
a number of attachments to affidavits that Bufa-

ing retrial of his action. We remark only that, as is the case
with questions of privilege generally, *it is for the trial judge* in
the first instance *to determine whether the proofs show respon-
dent to be a "public official."* [*Rosenblatt v Baer,* 383 US 75, 87-
88; 86 S Ct 669; 15 L Ed 2d 597 (1966). Emphasis supplied.]

This allocation of responsibility between the judge on the issue of
public official status—later extended by the Court to "public figures"
(see, e.g., *Curtis Publishing Co v Butts,* 388 US 130; 87 S Ct 1975; 18 L
Ed 2d 1094 [1967]; *Gertz, supra*)—and the jury on the issue of actual
malice, has been followed by federal courts. One might argue, how-
ever, that the *Rosenblatt* Court's use of the words "in the first
instance" means that if there is an issue of fact, then the question of
public figure status may go to the jury. The proposition of law for
which *Rosenblatt* is most often cited in this regard is that "whether
[an individual] is a public figure is a matter of law for the court to
decide." See, e.g., *Tavoulareas v Piro,* 260 US App DC 39, 49, 52; 817
F2d 762 (1987) (speaking of a judge's responsibility to determine a
plaintiff's public figure status, the court said that a judge " 'look[s] at
the facts, taken as a whole, through the eyes of a reasonable
person' "); *Trotter v Jack Anderson Enterprises, Inc,* 818 F2d 431, 433
(CA 5, 1987); *Fitzgerald v Penthouse Int'l Ltd,* 525 F Supp 585, 589 (D
Md, 1981) ("An initial consideration is the propriety of determining
the plaintiff's status on a motion for summary judgment. In *Rosen-
blatt v Baer,* 383 US 88, the Court noted that the question of the
plaintiff's status in a defamation action, like questions of privilege
generally, 'is for the trial judge in the first instance to determine.'
Consequently, if no genuine issue of material fact exists, when the
evidence is viewed in the light most favorable to the plaintiff, the
court may determine the plaintiff's status on a motion for summary
judgment, rather than wait until the close of the evidence"); *Grass v
News Group Publications, Inc,* 570 F Supp 178, 182 (SD NY, 1983);
*Bryant v Associated Press,* 595 F Supp 814, 817, n 1 (D VI, 1984)
("The Supreme Court treats both the 'public official' and 'public
figure' determinations as issues of law to be decided by the trial
court").

A majority of state courts, since 1979, follow *Rosenblatt. Fulton v
The Advertiser Co,* 388 So 2d 533 (Ala, 1980); *Cornett v Prather,* 293
Ark 108, 110-111; 737 SW2d 159 (1987) ("[w]hether an individual is a
'public official' may be a mixed question of fact and law, but it is a
matter which should be determined by the trial court before the case
is submitted to the jury"); *Roche v Egan,* 433 A2d 757 (Me, 1981);
*Marchiondo v Brown,* 98 NM 394; 649 P2d 462 (1982); *Martin v
Wilson Publishing Co,* 497 A2d 322 (RI, 1985); *Lewis v Coursolle
Broadcasting,* 127 Wis 2d 105; 377 NW2d 166 (1985). However, New
Hampshire and Massachusetts do not. See *Nash v Keene Publishing
Co,* 127 NH 214, 221-222; 498 A2d 348 (1985); *Baer v Rosenblatt,* 108
NH 368; 237 A2d 130 (1967); *Materia v Huff,* 394 Mass 328, 330-331;
475 NE2d 1212 (1985).

lino is a public figure. These attachments appear to consist of Congressional Committee reports, other reports, newspaper clippings, and copies of pages from books. Many of these attachments are undated and are not attributed to any publisher. A significant number of them are copied in an illegible manner. None of them are authenticated.

This Court cannot assume that the documents are what they purport to be, that they say what the defendants tell us they say, that it does not matter when they were published, and that it does not matter where or to what extent they were circulated.